UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America     :
                             :
                             :
          v.                 :         Case No. 2:05-CR-88
                             :
Daniel Wilder                :


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Paper 25, 26, 28, 29, 36, 37 & 45)

Defendant Daniel Wilder has filed motions to dismiss the Indictment based on the government's loss of material physical evidence, or, alternatively, to suppress all evidence concerning the missing items (Paper 25); for in camera review and/or disclosure of grand jury proceedings (Paper 26); for a bill of particulars (Paper 28); for leave to file additional motions, if necessary (Paper 29); for an evidentiary hearing concerning paper 25 (Paper 36); a motion in limine to exclude irrelevant and unduly prejudicial evidence relating to an alleged kidnapping (Paper 37); and finally, a motion to dismiss Count 3 (Paper 45).  On April 9, 2007, Chief Judge Sessions referred all of the motions for a report and recommendation.  An evidentiary hearing was held on July 11, 2007.  The hearing was continued on the

motion to dismiss Count 3 because of destroyed evidence and completed on July 18, 2007.  For the reasons set forth below, I recommend that the Court **DENY** Wilder's motion to dismiss and to suppress evidence (Paper 25), **DENY** in part and **GRANT** in part his motion for in camera review of grand jury proceedings (Paper 26), **DENY** his motion for a bill of particulars (Paper 28), **DENY** as moot his motion to file additional motions (Paper 29), **DENY** as moot an evidentiary hearing on the lost evidence (Paper 36), **DENY** his motion in limine to suppress evidence, and **DENY** his motion to dismiss Count 3. (Paper 45).

Factual Findings

Investigation

In 2001, the Southern Vermont Drug Task Force (SVDTF) began an investigation into Wilder's distribution of cocaine base in the Rutland, Vermont area.  As a part of that investigation, the SVDTF obtained information that Wilder was distributing cocaine base from his home and other locations in Rutland, Vermont.  Using several confidential informants, the SVDTF engaged in nine controlled purchases of cocaine base from Wilder's organization between June 8 and July 11, 2001.  Law enforcement observed the controlled

purchases visually and with an audio signal, which was recorded and preserved.  The Vermont forensic lab analyzed the drugs purchased and concluded that the drugs obtained on each occasion were cocaine base ("crack cocaine").  Based on the investigation and the controlled purchases, the SVDTF obtained a warrant from a state judge to search Wilder's residence at 120 Robbins Street, Rutland, Vermont.

The following items were seized during the search of Wilder's residence on July 18, 2001:

1. Dell lap top computer;

2. Rutland City Police Department law incident case no. 01RL00173;

3. Gray lock box containing 3 bundles of $20 bills;

4. Postal money order receipts;

5. Smith & Wesson handgun in black holster;

6. 5 knives, including a machete, and a knife with spikes;

7. 1 electric stun gun;

8. Shoe box containing night vision video and 7 long-blade knives;

9. Digital scale;

10. Miscellaneous documents and photographs;

11. Blue spiral notebook.

The cash ($3,000) from the lock box was forfeited pursuant to federal law after no identifiable fingerprints were located on the box or the currency.  At the time of the search, the SVDTF intended to pursue a state prosecution. Wilder's state charges for sale of cocaine and kidnapping were dismissed without prejudice on February 23, 2005 and July 28, 2005 respectively, in favor of the federal indictment returned on July 27, 2005.

The nine-count Indictment against Wilder charged:

(1) a conspiracy to possess with intent to distribute 50 grams or more of cocaine base from or about January 2000 to July 18, 2001, in violation of 21 U.S.C. §§ 846 and 841(a)(1);

(2) possession of a firearm during and in relation to a drug trafficking crime from on or about July 13, 2001 to July 18, 2001, in violation of 18 U.S.C. § 924(c)(1)(A)(1) and 18 U.S.C. § 2;

(3) discharge of a firearm during and in relation to a drug trafficking crime on or about July 13, 2001, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 2;

(4) distribution of cocaine base on or about June 8, 2001, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2;

(5) distribution of cocaine base on or about June 8, 2001, in violation of U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2;

(6) distribution of cocaine base on or about June 12,

4

2001, in violation of U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2;

(7) distribution of cocaine base on or about June 26, 2001, in violation of U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2;

(8) distribution of cocaine base on or about July 10, 2001, in violation of U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2;

(9) distribution of cocaine base on or about July 16, 2001, in violation of U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.

Six months later, on December 14, 2005, Vermont State Police (VSP) Detective Sergeant John Merrigan, then SVDTF supervisor, issued a memorandum to dispose of the above evidence. (Exhibit 4).  Such memoranda are issued periodically to prevent accumulation of unneeded evidence. Merrigan testified that his practice is to go through the various memoranda for each case and determine if the evidence could be destroyed.  He makes telephone calls to the appropriate prosecutor or case officer to inquire about the case status and if evidence may be destroyed.  In this case, he has no recollection of whom he called (state or county prosecutor) and what inquiries he made before completing the destruction order.

Detective David LaChance of the Rutland Police Department was the case officer for this case.  LaChance

left the SVDTF in 2005, but was involved in the decision to prosecute Wilder on federal charges.  Merrigan does not remember speaking with LaChance about the case status or destruction of the evidence.  Indeed, LaChance testified that he never spoke to Merrigan about destroying the evidence in December 2005 and that had Merrigan contacted him, he would have told Merrigan that the case was active and the evidence should be preserved.  LaChance learned of the destruction in late 2006 or early 2007.  Merrigan, however, had no knowledge of the July 2005 indictment and did not discover it in his December 2005 inquiries.  He first learned that the case was not closed and the evidence should have been preserved when Assistant United States Attorney Nolan inquired about the evidence in early 2007.

Pursuant to Merrigan's memorandum, the VSP custodian destroyed all of the above evidence except the lap top computer, the machete and a knife with spikes, which remain secured in evidence.[1]  On September 11, 2006, the Vermont Forensic Laboratory photographed and destroyed the seized gun and issued a firearms destruction report on September

---

[1] These items were not destroyed because of their size or other attributes that required extraordinary destruction procedures. They were awaiting destruction until the government contacted the evidence custodian in an effort to locate the items.

13, 2006.  Wilder and his investigator did not have the
opportunity to inspect these items before their destruction.

Kidnapping

Billy Jo Lethbridge made cocaine base sales on June 12
and July 10 on behalf of Wilder.  Lethbridge's half-brother,
Shawn Gallipo, made sales to informants on June 26 and July
10.  After executing the search warrant on Wilder's
residence, the SVDTF interviewed Gallipo and Lethbridge
about Wilder's drug distribution and related conduct.
During his statement, Gallipo described being held against
his will by Wilder, Wilder's brother, and another man named
Glen on July 13, 2001. He explained that Wilder threatened
him in order to locate Lethbridge, who Wilder believed had
been disloyal to Wilder.  During the incident, Glen
discharged a firearm in the air at least two times.  After
Glen discharged the firearm the second time, Gallipo told
Wilder and the others that Lethbridge was staying in their
parents' horse trailer.  Wilder poked Gallipo in the stomach
with a knife, stating that he wanted to "fucking stab" him.
The poke did not draw blood, but Wilder's brother then
slashed Gallipo's stomach, which did draw blood and caused
pain.  The group then drove to the Gallipo's parents' house

7

and the men searched for Lethbridge.  Lethbridge
corroborated seeing the men searching for him, being
interrupted by his parents shining a spot light on the
trailer and letting their dogs out.  He witnessed these
events as he hid in the horse trailer.

Based on the controlled purchases and the July 13
restraint of Gallipo, the Vermont Attorney General and the
Rutland County State's Attorney charged Wilder with aiding
in the commission of the sale of cocaine and kidnapping
respectively.  Both charges were eventually dismissed
without prejudice in favor of the federal indictment.

<u>Discussion</u>

I. Destroyed Evidence (Papers 25 & 36)

Wilder moves to dismiss the Indictment as a sanction
for the government's loss of material physical evidence.
The destroyed evidence impacts all counts of the Indictment.
Specifically, the gun from Counts 2 and 3 was destroyed and
the other lost evidence comprised materials associated with
the possession and distribution of drugs.  In the
alternative, Wilder seeks to suppress all evidence,
including testimony, concerning the lost items.  Wilder also

moves for an evidentiary hearing[2] concerning the destroyed evidence. (Paper 36).  The government contends that the destruction of some of the evidence in this case does not constitute a constitutional violation depriving Wilder of a fair trial.

The Second Circuit has noted that "[w]hen it occurs, the government's loss of evidence may deprive a defendant of the right to a fair trial."  United States v. Rahman, 189 F.3d 88, 139 (2d Cir. 1999).  In order for criminal prosecutions to comport with the prevailing notions of fundamental fairness, due process requires that the government disclose exculpatory evidence material to guilt or punishment to the defendant upon request.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Loss or destruction of evidence, however, is slightly different than evidence that is suppressed in violation of Brady.  California v. Trombetta, 467 U.S. 479, 486 (1984).

> Whenever potentially exculpatory evidence is
> permanently lost, courts face the treacherous task of
> divining the import of materials whose contents are
> unknown and, very often, disputed.  Moreover,
> fashioning remedies for the illegal destruction of
> evidence can pose troubling choices . . . [such as]
> barring further prosecution or suppressing . . . the
> [government's] most probative evidence.

---

[2] As noted, an evidentiary hearing was held on July 11, 2007.

9

Id. at 486-87.

The imposition of sanctions on the government for losing evidence turns on the government's culpability, and the prejudicial effect of the loss on the defendant. Rahman, 189 F.3d at 139.  As a threshold requirement to imposing sanctions for lost evidence, the loss must be "chargeable to the [government]." Rahman, 189 F.3d at 139 (quoting Colon v. Kuhlmann, 865 F.2d 29, 30 (2d Cir. 1988)). Sanctions are appropriate based on the consideration of three factors: (1) the evidence's exculpatory value, Trombetta, 467, U.S. at 489; (2) the defendant's inability to "obtain comparable evidence by other reasonably available means," Id.; United States v. Bakhtiar, 994 F.2d 970, 976 (2d Cir. 1993) (sanctions for lost evidence requires showing that losses prejudiced the defense); and (3) the government's bad faith.  Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Trombetta, 467, U.S. at 488 (noting no violation where failure to preserve evidence was in good faith and in accord with normal practice).  Under Brady, the government's bad faith is irrelevant where it fails to disclose material exculpatory evidence.  Illinois v. Fisher, 549 U.S. 544, 547 (explaining Brady standard).  The government's bad faith is

required, however, where the evidence is only "potentially useful" rather than "exculpatory." Id. at 548 (distinguishing Youngblood standard from Brady standard). In Youngblood, the exculpatory value of the evidence was not apparent before the evidence was destroyed; more tests *may* have exonerated the defendant. Youngblood, 488 U.S. at 57 (emphasis added).

The threshold requirement for the loss to be chargeable to the government has been met because after the search of Wilder's house, the evidence was seized by state law enforcement and subsequently destroyed by the VSP custodian at the request of Merrigan  and the Vermont Forensics laboratory.   In addition, the Court accepts Wilder's contention that he is unable to obtain comparable evidence. Tracking down two other individuals, who may or may not be criminally involved, is not comparable to the physical evidence destroyed.   Accordingly, the issue is whether Wilder meets the first and third factors.

As to whether the destroyed evidence had exculpatory value, Wilder alleges that each item is "highly likely" to be exculpatory. (Paper 25, at 2).  He points to the absence of expected information on his computer and notebook and the

11

absence of his fingerprints on any of the items as exculpatory. (Id.).  The government, on the other hand, argues that absence of information and fingerprints is speculative, that it was not apparent prior to destruction,[3] and even if apparent, would not be exculpatory given that Wilder is charged with using others to sell cocaine base from his residence, which would not make the absence of Wilder's fingerprints exculpatory.

Although the preservation of the evidence may conceivably have tended to exculpate Wilder, like the Youngblood evidence, more examination of the destroyed items was required to determine the exculpatory value.  Under these circumstances, the destroyed evidence can be said to be "potentially useful" rather than "exculpatory" under the Brady standard.  Wilder's possession of the various weapons (knives, a gun and a stun gun) in his home, without more, tends to inculpate, rather than exculpate Wilder. Similarly, the existence of a scale in Wilder's home, whether or not it contained his fingerprints, in the context of the other evidence, is more inculpatory of drug trafficking that exculpatory.

---

[3] The Court notes that only the lock box and $20 rolls were examined for fingerprints and no identifiable prints were discovered.

12

Where, as here, the Court cannot determine whether the evidence would indeed have been exculpatory, a due process violation arises only if there is a finding of bad faith in the failure to preserve the evidence.  Youngblood, 488 U.S. at 58.  Wilder relies on Bahktiar for the proposition that the absence of a reliable system of preserving evidence in this case was bad faith per se.  In Bahktiar, the Second Circuit noted that "there may be circumstances in which government sanctions for negligent loss of evidence are appropriate, per Bryant."  Bahktiar, 994 F.2d at 976.  The special circumstance in United States v. Bryant, 439 F.2d 642 (D.C. Cir. 1971) (overruled on other grounds by Arizona v. Youngblood, 488 U.S. 51 (1988)), however, was that the government did not have a reliable system for preservation of evidence and the sanction was to require such a system as the only way to protect Brady material before the defendant had an opportunity to request it.  Bahktiar, 994 F.2d at 975-76 (citing Bryant, 439 F.2d at 650-53).  The Bahktiar court, however, foreclosed the possibility of using the Bryant standard where evidence was "potentially exculpatory."  Id. at 975 (explaining Bryant's continuing validity after Youngblood does not extend to "potentially

13

exculpatory" evidence, which was at issue in <u>Youngblood</u>).
Thus, to prevail, Wilder must show the government's bad
faith without relying on the <u>Bryant</u> reliable protocol
standard.

Accordingly, before imposing sanctions, the Court must
determine whether the government's failure to preserve the
evidence was in bad faith.  It is troubling that the very
evidence presented to the grand jury was destroyed six
months after the indictment.  Notwithstanding the change
from a state prosecution in favor of a federal indictment,
the government should have gathered the evidence used to
secure the indictment and preserved it for trial.  The Court
agrees with defense counsel that this case is different from
this Court's most recent destroyed evidence opinion, <u>United
States v. Shine</u>, No. 2:05-CR-25, (D. Vt. June 27, 2007),
because in that case Shine's indictment was pending.  Here,
Wilder's indictment was six months old when the evidence
destruction occurred.  Moreover, there is minimal
information about the procedure used to determine whether
evidence ought to be destroyed.  Merrigan made telephone
calls to inquire into the status of cases, though he does
not remember his inquiry in this case.  He did not call the

case supervisor, LaChance, who would have alerted him to the indictment.  Whomever he did reach apparently gave him the wrong information.  While Merrigan has no memory of his inquiries, it is clear that had he verified his inaccurate information with someone more familiar with the case, the evidence would have been preserved.

Despite the troubling result of the governmental errors in this case, the failures do not amount to bad faith.  The Court hopes that the procedures that went awry here are improved for the future.  As explained above, for the destruction of potentially exculpatory evidence, there must be a higher standard of bad faith than an unreliable system of evidence preservation.  Bakhtiar, 994 F.2d at 975. Merrigan's apparently informal procedure was ineffective in verifying the correct disposition of this case. Nevertheless, there is no evidence that the errors were made in bad faith, rather than from negligence, which the government does not deny.  Some of the evidence was saved when the United States Attorney's office inquired about its whereabouts and, upon learning about the destruction, ensured the remaining evidence was preserved.  In addition, there are photographs of the destroyed evidence available

for trial.  No sanctions are warranted here and, therefore, the Court recommends the motions to dismiss be denied and suppression of all evidence relating to the destruction of this evidence also be denied.

II. Count 3 and Kidnapping evidence (Papers 37 & 45)

Wilmer argues that Count 3 must be dismissed because there is no nexus between the possession and discharge of a firearm during a kidnappng and a drug transaction, which makes the conduct fall outside the reach of the statute (18 U.S.C. § 924(c)(1)(A)(iii)) under which Wilder is charged. (Paper 45).  He also argues that all evidence of the alleged kidnapping of Gallipo, the alleged use of a knife and alleged discharge of a firearm must be suppressed as irrelevant and unduly prejudicial to the charges in the indictment. (Paper 37).  The government contends that this Court should deny the motion to exclude because the disputed kidnapping evidence constitutes the factual basis of Count 2 (possession of a firearm), Count 3 (discharge of a firearm in relation to drug trafficking), and is relevant to Count 1 (conspiracy to possess with intent to distribute cocaine base) because the kidnapping and gun brandishing were acts in furtherance of a conspiracy.  The government also argues

16

that the evidence does not concern prior bad acts excluded by F.R.E. 404(b) and is not unduly prejudicial.

In Count 3, Wilder is charged with violating 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 2.  Section 924(c)(1)(A)(iii) prohibits using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime" and imposes a term of imprisonment of not less than 10 years if the firearm is discharged. Id. Section 2 makes someone who aids and abets the commission of a crime punishable as a principal.  Count 3 is based on an individual identified only as "Glen" discharging the weapon while he, Wilder and others held Gallipo against his will in order to locate Lethbridge.  Wilder alleges that the discharge of the gun fails to meet the "in relation to" part of § 924(c)(1).  He argues that there was no nexus between the gun discharging during the kidnapping on July 13 and his drug trafficking charges.  See United States v. Reyes Diaz, 797 F. Supp. 96, 97 (noting "objective of § 924(c)(1) is to penalize drug transactions which could easily escalate into violence.").  The issue is whether kidnapping and firing a gun to intimidate a co-conspirator of Wilder's drug trafficking enterprise in order to find a second co-

17

conspirator creates a nexus between the gun and the drug transaction.

Despite the absence of a kidnapping count in the indictment, there is a nexus between the gun Glen discharged and a drug trafficking crime.  Gallipo sold cocaine base for Wilder on at least 20 occasions (Doc. 43, Ex. 6) as did Lethbridge. (Id., Ex. 7).  Wilder's accomplice, Glen, brandished and discharged the firearm to intimidate Gallipo into telling Wilder where Lethbridge was hiding.  Wilder wanted to find Lethbridge because he believed Lethbridge had told the police about Wilder's drug trafficking enterprise. Thus, while a drug transaction was not occurring simultaneously with the discharge of the gun, the discharge was in furtherance of the drug trafficking conspiracy because Wilder was motivated by the fear of his enterprise being discovered by law enforcement.  Accordingly, Count 3 meets the requirements of § 924 and the motion to dismiss should be denied.

The evidence relating to the July 13, 2001 incident is relevant to the drug conspiracy and drug trafficking counts in the indictment because by kidnapping and threatening one of Wilder's co-conspirators to get to another co-

18

conspirator, it makes the existence of the drug conspiracy (Count 1) and the discharge of the gun by an accessory (Count 3) more probable than without the evidence relating to the incident.  See Fed. R. Evid. 401, 402.  Similarly, the evidence Wilder seeks to exclude does not concern other crimes or bad acts.  Rule 404(b) prohibits admission into evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).

Wilder makes much of the fact that the federal indictment does not charge him with kidnapping and therefore concludes that it is a prior bad act, which is excludable under F.R.E. 404(b).  On the contrary, however, the June 13, 2001 kidnapping incident and the evidence derived therefrom relate to the very crimes with which Wilder is charged in this case.  The incident involved a squabble about selling cocaine base:  Wilder believed Lethbridge had been disloyal to him regarding Wilder's illicit drug trafficking business and used Gallipo, another underling, to find Lethbridge.

19

Threats to a co-conspirator do not constitute other wrongs. See <u>United States v. Williams</u>, 985 F.2d 634, 638 (1st Cir. 1993) (overheard threats to co-conspirator about money from drug sales coming up short properly admitted).  Accordingly, the disputed evidence is not of a prior crime or bad act because it is inextricably tied to the conduct for which Wilder is charged in the Indictment. <u>Cf.</u> <u>United States v. Leyeni</u>, 90 F.3d 514, 520-21 (D.C. Cir. 1996) (finding testimony about heroin market in Nigeria likely inadmissible for conduct committed in United States, but harmless error based on other considerations); <u>United States v. Burke</u>, 948 F.2d 23, 26-27 (1st Cir. 1991) (use of child as a shield excluded as prior bad act in unlawful possession of firearm case).

Finally, the disputed evidence is not unduly prejudicial to Wilder.  Fed. R. Evid. 403 gives courts the discretion to exclude evidence whose "probative value is substantially outweighed by the danger of unfair prejudice." <u>Id.</u>  While any proof of guilt is bound to prejudice the interests of a defendant, Rule 403 is only concerned with prejudice that "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its

20

admission into evidence." <u>United States v. Gelzer</u>, 50 F.3d 1133, 1139 (2d Cir. 1995).  Adverse facts that are not at issue or that "unfairly excite emotions against the defendant" cause the unfair prejudice Rule 403 seeks to avoid.  <u>United States v. Figueroa</u>, 618 F.2d 934, 943 (2d Cir. 1980).  Rule 403 mandates the Court to balance to probative value against its potential prejudicial effect.

The evidence here is probative of the furtherance of the drug trafficking conspiracy (Count 1), the distribution of cocaine base on the occasions Gallipo and Lethbridge were involved (Counts 4-9), and the discharge of a firearm in relation to a drug trafficking crime (Count 3).  The kidnapping, the use of a knife on Gallipo, and the discharge of a gun in order to get information from Gallipo is certainly prejudicial to Wilder, especially because without this evidence, the jury would not learn of the kidnapping incident.  Nevertheless, the evidence from the kidnapping is tied to the underlying charges at issue here and does not unfairly excite emotions against Wilder.  Thus, the probative value of the July 13 kidnapping, assault with a knife, and discharge of a firearm outweigh the prejudicial effect on Wilder and is admissible under Rule 403.

As the Court indicated to the parties at the July 11, 2007 hearing, this evidentiary ruling is based on the pleadings.  Wilder can renew this motion based on the evidence at trial.

III. In Camera Review and/or Disclosure of Grand Jury Proceedings (Paper 26)

Wilder alleges two irregularities in the grand jury proceedings leading to the return of an Indictment.  First, he alleges that the Indictment was not signed by the grand jury foreperson.  Second, he contends that the grand jury may have served more than 18 months.  Wilder moves for the Court to examine the grand jury proceedings in camera to determine whether (1) there were at least 16 members and 12 voted to indict; (2) the foreperson administered oaths and signed the indictment; (3) any other irregularities occurred; and finally (4) to disclose when the grand jury that returned the Indictment was originally sworn and whether extensions to the 18 month grand jury term were requested.

The government's opposition papers and the government's proffer at the July 11, 2007 hearing clear up the issue of whether the grand jury served more than 18 months in

violation of Fed. R. Crim. P. 6(g).  The grand jury that returned the indictment was empaneled on April 6, 2005 so it had been serving less than four months when the indictment was returned in July 2005.  Witnesses did testify before a grand jury in November of 2003, but that grand jury did not return the indictment.  As to the lack of signature, the Supreme Court has indicated that the responsibilities of the grand jury foreman are "clerical in nature" and that "the absence of the foreman's signature is a mere technical irregularity that is not necessarily fatal to the indictment."  Hobby v. United States, 468 U.S. 339, 345 (1984).  Moreover, there is evidence that the original indictment against Wilder was signed, had its signature redacted to preserve the foreperson's identity before being scanned into the Court's system, and was then misplaced. The government suggests that evidence of the signature redaction can be seen on the scanned indictment, which proves that an indictment was indeed returned against Wilder.

Nevertheless, to ensure that there were no irregularities, the Court has reviewed in camera the transcript of the indictment return.  In its review, the

Court finds that there were no irregularities in the July 27, 2005 return as to the number of grand jurors concurring in the Indictment.  The Indictment was properly returned in open court to Judge Murtha who determined that it was in order.  Wilder's claim that the grand jury process was flawed is a fishing expedition without any factual basis.

III. Bill of Particulars (Paper 28)

Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, Wilder seeks a statement of the location, date, nature, and addresses of individuals involved in the alleged acts of the conspiracy.  He also seeks general facts known to the government about the conspiracy, unindicted co-conspirators, and government witnesses.  As of the July 11, 2007 hearing, he no longer sought information about his possession and discharge of a firearm.

The decision whether to grant a bill of particulars is within the sound discretion of the court.  United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).  A defendant is entitled to seek a bill of particulars in order to "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a

plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  A bill of particulars is a statement of what the government will or will not claim in its prosecution, United States v. GAF Corp, 928 F.2d 1253, 1260 (2d Cir. 1991), and confines the government's trial evidence to the particulars furnished.  United States v. Payden, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).

The Second Circuit has emphasized that disclosure of evidentiary detail is not the function of bill of particulars.  United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990).  It is not intended to compel the government to disclose its legal theory or the details of how it intends to prove the charges.  United States v. Hunter, 13 F. Supp. 2d 586, 590 (D. Vt. 1998).  Similarly, it is not enough that the information will be helpful to the defendant.  Payden, 613 F. Supp. at 816.

The Indictment gives Wilder notice in sufficient detail of the charges against him.  Given the information that the government has already provided in addition to the

indictment,[4] the information Wilder seeks in his request for a bill of particulars is not necessary to provide him adequate notice of the charges he faces.  The government need not provide Wilder with a blueprint for every part of its case; it need only put Wilder on notice to avoid surprise at trial.  The government has fulfilled its duty. Accordingly, this Court recommends Wilder's motion for a bill of particulars be denied.

IV. Motion to File Additional Motions (Paper 29)

Wilder suspects that the affidavit used to secure the search warrant contained inaccuracies and wishes to interview all individuals to ascertain whether to file a Franks motion.  Franks v. Delaware, 438 U.S. 154 (1978).  Of the 16 lay persons named on the government's witness list, Wilder believes many are also confidential informants from the search warrant affidavit.  To verify the accuracies of the search warrant affidavit, Wilder wanted to interview the individuals who were both confidential informants and disclosed witnesses.  At the July 11, 2007 hearing, however,

---

[4] The government supplemented the indictment with investigative reports and/or affidavits about the nine controlled purchases; an investigative report from an attempted purchase; audio recordings of the controlled purchases; forensic testing reports of the purchased cocaine base; and warrant application for 120 Robbins Street with supporting affidavit, the warrant and completed return. (Paper 32-1, at 6).

this Court ordered Wilder to submit a supplemental memorandum explaining the basis for alleging the search warrant's inaccuracies.  No supplemental memorandum was filed.  On August 6, 2007, however, Wilder withdrew his motion to disclose the identities of confidential informants to determine the accuracy of the warrant affidavit. Accordingly, the motion to file additional motions is moot.

<u>Conclusion</u>

For the reasons set forth above, I recommend that both of Wilder's motions to dismiss be denied, his motion for in camera review be denied in part and granted in part, his motion for a bill of particulars be denied, his motion to file additional motions be denied, and his motion in limine be denied.

Dated at Burlington, in the District of Vermont, this 9th day of August, 2007.

                         /s/ Jerome J. Niedermeier
                         Jerome J. Niedermeier
                         United States Magistrate Judge


Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure

to file objections within the specified time waives the right
to appeal the District Court's order. See Local Rules 72.1,
72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b),
6(a) and 6(e).

     ‾‾‾‾‾‾

     ‾‾‾‾‾‾